HAZOURI, J.
Jean Thermidor was charged by information with one count of armed robbery with a firearm which occurred on June 21, 2006. The state filed a notice of intent to offer Williams[1] rule evidence under rule 90.402. A hearing was held and the trial court granted the motion. At trial, Ther-midor was convicted of the lesser included offense of robbery and sentenced to fifteen years in prison. He appeals that conviction. We reverse, finding the trial court erred in admitting into evidence the prior un *1186 charged crime of armed robbery which occurred on March 10, 2006.
The state’s first witness at trial, Kizzie Woods, testified that on the evening of June 21, ½006, she was at her home in Pompano Beach at about midnight. She was on the porch or stoop of her apartment when she saw a man across the street who came up to speak with her and called himself Roody. She got his phone number in order to talk and maybe go out. He asked her to call him a cab, which she did from her cell phone. The cab company asked for her number, the pickup address, which was her address, and she gave them Roody’s name. She stayed outside and saw Roody get in the cab and leave. She called him later on that evening and spoke with him. He said he was going home. She identified Roody in a lineup and identified him in the courtroom as Thermidor.
The victim, Jehad Ahmad, testified he has been employed as a Yellow Cab driver since 1994 and worked on June 21, 2006. He started that shift at 10:00 P.M. on June 20. Cab drivers are dispatched by computer and he accepted a call from Pompano Beach having made other pick-ups in that area. A lady, Ms. Woods, and a gentleman were waiting.[2] She was outside with Roody, which is the name the computer gave him. Roody got in the rear passenger seat. Ahmad’s cab did not have a partition. Roody gave him an address of 56th and Oakland Park Boulevard in Laud-erhill.
When Ahmad picked up a late-night fare, he asked for the money up front. He told Roody it was a long distance and the cost was $40. Roody handed him the money with no problem. Ahmad described the route he took.
When Ahmad was approaching the Turnpike on Oakland Park Boulevard west, he saw Roody on a cell phone. He heard him talking but did not hear what he was saying. As he approached 56th, he had a bad feeling so he made a u-turn and went to Denny’s to drop off his passenger. Roody refused to be dropped off there saying he lived a block away. Having no choice, Ahmad drove Roody to Inverrary Village according to Roody’s directions. Once inside, Roody told Ahmad to turn right, go all the way down, make a left, make a right, go all the way down and make another right. He was at a dead end, facing a building. Ahmad put the car in park and turned to give change back to his passenger, at which time two men approached the cab. One of the men had a gun. Roody “flew up” to the front seat and got the keys from the ignition. Roody did not have a gun.
The man with the gun and Roody both asked Ahmad where his money was. Roody searched Ahmad’s socks, pants pockets, and all over. He held Ahmad’s head down between the two front seats. Ahmad gave him the money and Roody continued holding his head down. Ahmad told him his wallet was in the glove compartment. Roody took the wallet with $80 in it, the money in his pocket, as well as the money Roody had given him earlier. He also took Ahmad’s cell phone. Ahmad thought the man with the gun wanted to shoot him. Eventually the two men from outside left. Roody kept holding his head down, then opened the door and threw the keys as he ran away. Ahmad drove to the security office and they called the police. Later he met Detective Brian Hardy of the Lauderhill Police Department. Ahmad was shown a lineup, but was not able to make an identification. Although Ahmad testified that he would know Roody if he *1187 saw him, Ahmad could not identify him in court.
Pursuant to the trial court’s ruling on the admissibility of the Williams rule evidence, the state called Sylvain Pluviose to testify about the prior uncharged crime of armed robbery. On March 10, 2006, Pluv-iose was employed as an independent contractor for Yellow Cab and was working in the Plantation area when he was dispatched to the Plantation Inn Motel. The name of the passenger on the computer was Mike. He was outside and ready to go when he arrived. The man confirmed his name was Mike. During a short conversation, Mike told him to go to 56th Avenue and 29th Street, which was Inverrary Village in Lauderhill, where Pluviose made a lot of drops.
When it’s late, taxi drivers try to drop a fare off at the entrance, but Mike did not want to be dropped off there, so Pluviose proceeded into the complex. Pluviose was told to go right and then left and they ended up at a dead end. When he stopped the cab, the passenger opened the door and as he stepped out of the cab, he pulled a gun from his waist. Pluviose realized he was being robbed. He told the passenger not to do anything stupid and asked where the money was. Pluviose then ran out of the cab.
Pluviose ran to some bushes about 100 meters away and hid. He ran because getting out of the dead end would have been a hard maneuver. He had his cell phone when he ran and he called the police. He identified Thermidor in a photo lineup. He also identified him in court.
In its order granting the state’s motion pertaining to Williams rule evidence, the trial court found the following similarities:
[T]he victim’s [sic] are taxi cab driver’s [sic]. The victim’s [sic] both picked up the defendant after midnight and were instructed to drive to the Inverrary Village Apartment complex located at the 2900 block of NW 56th Avenue. Once inside the complex the defendant used very direct and specific instructions to lead the victim’s [sic] to the back of the complex. This area of the complex is a dead end. The two victims’ [sic] were then robbed at gunpoint. They both identified the defendant out of a photo lineup. The defendant lives 150 yards away from Inverrary Village apartments.
The Dissimilarities in these cases are that ... once the defendant arrived at the dead end at the Invennary [sic] Village Apartment Complex, the victim was approached by the two other males, and with the assistance of the defendant, was robbed at gunpoint. In [the other case] the defendant had a gun on his person and robbed the victim by himself.
Thermidor argued to the trial court that the facts in each case were not so unique and similar to allow collateral crime evidence. The state argued that the evidence would show identity and modus operandi.
The Williams rule was codified in section 90.404(2), Florida Statutes (2005), which provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
In Williams v. State, 662 So.2d 419 (Fla. 3d DCA 1995), the Third District applied this rule and held:
Relevant evidence of similar crimes may not be admitted merely to prove bad character or propensity to commit crime. To prevent this, Williams rule *1188 analysis must be strictly, not loosely, applied. Proper Williams rule evidence is that which possesses “obvious and telling similarities” to the crime charged. Especially when proferred [sic] to prove identity, Williams rule evidence must indicate circumstances so unique as to point only to the defendant.
Id. at 420 (citations omitted). “To be admissible under the Williams rule, the identifiable points of similarity must pervade the compared factual situations, and, if sufficient factual similarity exists, the facts must have some special character or be so unusual as to point to the defendant.” Thompson v. State, 494 So.2d 203, 204 (Fla.1986). “[S]imilar fact evidence regarding a party whose conduct is in question ‘is not competent to prove the commission of a particular act charged against him, unless connected in such a way as to indicate a relevancy beyond mere similarity in certain particulars.’ ” Williams, 110 So.2d at 659 (citation omitted).
The similarities in the instant case were (1) both cab drivers picked up a black male and drove him to Inverrary Village. Ahmad testified that he had taken fares there on other occasions. (2) Both crimes were armed robbery of a cab driver. (3) The robberies occurred at the same location, Inverrary Village, at a dead end street. The state asserts that very specific directions were given to the dead end street. However, the directions given to each of the drivers were not exactly the same, according to the testimony, and contrary to the state’s assertion, it is not clear from the testimony that they went to the same dead end street.
The dissimilarities between the two cases were that (1) Thermidor carried a gun and committed the crime alone in the collateral crime case and in the instant case there were two other robbers, one of whom possessed the gun; (2) with respect to the actual robberies, the evidence did not show that how the robber(s) proceeded were similar in any way, except that they both involved taking money from the cab drivers; and (3) robbery of cab drivers is a common occurrence in South Florida and elsewhere, and does not constitute a signature-type crime.
In this case, it appears that the dissimilarities outweigh the similarities, especially in light of the addition of two other robbers in the instant case. Furthermore, there does not appear to be anything especially unique about the circumstances to point to Thermidor and only Thermidor. The admission of collateral crimes evidence is subject to the abuse of discretion standard of appellate review. Gadson v. State, 941 So.2d 573, 575 (Fla. 4th DCA 2006). The trial court abused its discretion in this case due to the lack of anything special, unusual, or unique about the robberies of these two cab drivers.
The state argues that if it was error to admit evidence of the collateral crime, it was harmless because the testimony at trial from Ms. Woods proved that Thermidor was in the taxi cab riding to Inverrary. Therefore the state asserts that the identification of Thermidor did not rest only on the collateral crime evidence. Of course the state’s argument overlooks the fact that the victim, Ahmad, was unable to identify Thermidor as the perpetrator of the robbery. Additionally, if the state had proven identity to its satisfaction by the testimony of Ms. Woods, there was no need to introduce collateral crime evidence to prove identification. The collateral crime evidence, however, did show Thermidor’s propensity for committing robberies. Admission of irrelevant fact evidence is “presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime *1189 charged.” Robertson v. State, 829 So.2d 901, 913-14 (Fla.2002) (citations omitted). We conclude that the state has not overcome this presumption of harmful error and has not shown beyond a reasonable doubt that the error was harmless. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Since we are reversing this case for a new trial, we also address Thermidor’s assertion that the trial court erred in prohibiting his counsel from attempting to impeach Ahmad by use of his pretrial deposition. The trial court prohibited the use of Ahmad’s deposition for impeachment purposes because the deposition had not been filed with the court. There is no requirement that a pretrial deposition be filed with the court in order to be used at trial for impeachment purposes. See Smith v. State, 594 So.2d 846, 847 (Fla. 2d DCA 1992).

Reversed and remanded for a new trial.

CIKLIN and LEVINE, JJ., concur.

. Williams v. State, 110 So.2d 654 (Fla.1959).

. Ahmad testified he had just seen the same lady, Ms. Woods, leave the courtroom.